## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINDSEY NYSTROM AND ANDREA PRESTON, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HANSCOM FEDERAL CREDIT UNION and DOES 1 through 100,<br><br>Defendants. | **Case No.:**<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

Plaintiffs Lindsey Nystrom and Andrea Preston ("Plaintiffs"), by and through their attorneys, bring this class and representative action against Hanscom Federal Credit Union and DOES 1 through 100 (collectively "HFCU" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiffs or their counsel.  Allegations pertaining to Plaintiffs or their counsel are based upon, *inter alia*, Plaintiffs' or her counsels' personal knowledge, as well as Plaintiffs' or her counsels' own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiffs to assert claims in their own right, and in their capacity as the class representatives of all other persons similarly situated, and in their capacity as a private attorney general on behalf of the members of the general public.  Defendant wrongfully charged Plaintiffs and the Class Members fees related to their checking accounts.  On behalf of themselves and all members of the putative class, Plaintiffs reject and decline the "Resolution of Disputes by Arbitration" provision which

Defendant sets forth for the first time in the Account Agreement it contends becomes effective on September 1, 2020.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, HFCU's policy and practice to maximize the fees it imposes on members.  The conduct has the overwhelming common denominator of breaching its members' contracts and violating laws so as to maximize HFCU's fee income.  This conduct includes but is not limited to, assessing an overdraft fee or NSF fee on transactions when by Defendant's own calculations there was enough available money in the checking account to cover the transaction at issue when authorized and the money was specifically sequestered for that transaction but would be assessed an overdraft fee anyway; and, imposing more than one NSF fee, or an NSF fee followed by overdraft fee, on the *same* electronic item or check. The charging of such fees breaches HFCU's contracts with its members, who include Plaintiffs and the members of the Class.

4.      The charging for such fees also violates federal law.  HFCU failed to follow basic prerequisites in its overdraft fee system as required by Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*), which include, *inter alia*, providing a separate overdraft fee contract that describes the actual overdraft and non-sufficient funds practice used by HFCU, which may be rejected by the customer, and only collecting fees in the manner described by the fee contract.  Regulation E prohibits HFCU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)) if it does not meet the Regulation E prerequisites, but HFCU did charge overdraft fees without meeting the Regulation E prerequisite.  Further, HFCU violated Regulation E by, *inter alia*, offering incentives to opt in which were not offered to those who did not opt, or, by not abiding by its Opt-In Contract terms.

## **PARTIES**

5.      Plaintiff Lindsey Nystrom is a resident of  Massachusetts and had a checking account with HFCU at all times relevant to the class action allegations.

6.      Plaintiff Andrea Preston is a resident of Massachusetts and had a checking

account with HFCU at all times relevant to the class action allegations.

7.      Based on information and belief, Defendant HFCU is and has been a federally chartered credit union with its headquarters located in Massachusetts.  HFCU has assets of approximately $1.5 billion, over 91,000 members, and more than 20 branches in Massachusetts. HFCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

8.      Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of HFCU and, upon information and belief, also own and/or operate HFCU branch locations.  Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term "HFCU" is also inclusive of Defendants DOES 1 through 100.

9.      Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

10.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

11.      At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

12.      Whenever reference is made in this Complaint to any act, deed, or conduct of

Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

13.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

14.     This Court has subject matter jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d).

15.     Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

16.     HFCU offers its consumer banking customers a checking account.  One of the features of an HFCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of an HFCU checking account include the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

17.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), HFCU assesses what it calls "NSF fee" and/or "overdraft fee."  As alleged further below, these fees either were charged in breach of the contracts, or were charged without required predicate compliance with law.

18.     Overdraft fees and Nonsufficient Funds fees ("NSF fees") constitute the primary fee generators for banks and credit unions.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median

overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as HFCU, overdraft fees and NSF fees are a major source of revenue and a profit center.

19.     Since 2000, the average dollar amount of a checking account transaction has become much lower because customers, and especially younger customers, use debit cards instead of cash or credit cards for everyday purchases.   In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011.[1]   That has translated to the average dollar amount of overdraft transactions being lower than in 2000.  However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up.

20.     The high cost of an overdraft fee is also usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

21.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers

---

[1]  Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23        (last visited March 7, 2019).

assessed overdraft fees earned under $40,000 per year. (*Id*. at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id*. at p. 3).

22.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The rulings of these cases have predominantly fallen in favor of consumers, forcing the banks and credit unions to repay their customers significant amounts of wrongfully collected overdraft fees.

23.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")). On information and belief, HFCU calls its Regulation E program the "Discretionary Overdraft Privilege Policy."

24.     To qualify as affirmative consent for the Regulation E program, the Opt-In Contract must include, but is not limited, to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted-in to the overdraft program.

25.     If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.  On information and belief, although formal discovery will be required to confirm this, HFCU did not fulfill these Regulation E prerequisites. The requirements which it did not fulfill, on information and belief, include, *inter alia*, in its actual Regulation E Opt-In Contract, failing to correctly describe the program pursuant to which HFCU actually assessed these overdraft fees, and failing to abide by its terms.

26.     An accounting gimmick related to increasing overdraft and NSF fees used by some financial institutions, which on information and belief financial institutions such as Defendant may use, is an "approve positive – post supposedly negative" ("APPSN") method of calculation. It works as follows. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, HFCU immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount.  As a result, customers' accounts will always have sufficient available funds available to cover these transactions.

27.     However, HFCU still assesses $30 overdraft fees on many of these transactions and mispresents its practices in its account documents. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, HFCU later assesses overdraft fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

28.     Additionally, and adding confusion to the matter, it appears Defendant mis-uses and mixes up the terms "overdraft fee" and "NSF fee," not using the terms correctly to reflect the

actual action taken by Defendant, or actual nature of the transaction. In other words, it appears Defendant may improperly be calling certain "overdraft fee" transactions instead "NSF fee" transactions. Therefore, while Plaintiff references "overdraft fee", Defendant in its account statements might erroneously be labeling certain of these as "NSF fees."

29.     HFCU maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, HFCU subtracts the dollar amount of the transaction from the customer's available balance and places such funds on a hold. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

30.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. Accordingly, many subsequent transactions incur overdraft fees due to the unavailability of the funds sequestered for those debit card transactions.

31.     Still, despite keeping those held funds off-limits for other transactions, HFCU improperly charges overdraft fees (and possibly erroneously calls them NSF fees) on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

32.     The Consumer Financial Protection Bureau in its Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights" has expressed concern with this very issue, calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused

harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

33.     There is no justification for these practices, other than to maximize HFCU's overdraft fee revenue. APPSN transactions only exist because intervening checking account transactions supposedly reduce an account balance. But HFCU is free to protect its interests and either reject those intervening transactions or charge overdraft fees on those intervening transactions—and it does the latter to the tune of millions of dollars. But HFCU was not content with these millions in overdraft fees. Instead, it sought millions *more* in overdraft fees on these APPSN Transactions.

34.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in HFCU's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of HFCU's processes and practices. These practices also exploit contractual discretion to gouge consumers. In short, HFCU is not authorized by contract to charge overdraft fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

## **Mechanics of a Debit Card Transaction**

35.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from HFCU.  When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to HFCU, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

36.     At this step, if the transaction is approved, HFCU immediately reduces the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

37.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations: "When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions."  Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

38.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  HFCU decides whether to "pay" debit card transactions at authorization.  If it decides to pay, after that, HFCU is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point— when HFCU may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the credit union has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand,

regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009). Notably, there is no change—***no impact whatsoever***—to the available funds in an account when this step occurs.

**HFCU's Account Contract**

39.     Plaintiffs each have an HFCU checking account, each of which is currently governed by HFCU's Account Agreement. The Account Agreement and relevant contract documents covering overdraft fees provide that HFCU will not charge overdraft fees on transactions that have sufficient funds to cover them at the time they are initiated.

40.     For debit card transactions, this moment occurs at the moment of authorization. For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet HFCU assesses overdraft fees on them anyway (and may erroneously mis-label them as "NSF fees").

41.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN transactions.   In fact, HFCU actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses the secret posting process described below.

42.     HFCU charges overdraft fees (which it sometimes erroneously calls "NSF fees") even when sufficient funds exist to cover transactions that are "initiated and authorized" into a positive balance. No express language in any document states that HFCU may impose overdraft fees on any APPSN Transactions.

43.     The account documents misconstrue HFCU's true debit card processing and overdraft practices. First, and most fundamentally, HFCU charges overdraft fees on debit card transactions for which there are sufficient funds available to use to cover the transactions.

44.     HFCU assesses overdraft fees on APPSN Transactions that **do** have sufficient funds available to cover them throughout their lifecycle. HFCU's practice of charging overdraft

fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.  This discrepancy between HFCU's actual practice and the contract causes consumers like Plaintiffs to incur more overdraft fees than they should.

45.    Sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice. These withdrawals take place upon initiation and thus they cannot be re-debited later. But that is what HFCU does when it re-debits the account during a secret batching posting process.

46.    In reality, HFCU's actual practice is to attempt the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.   At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, HFCU cannot then charge an OD/NSF fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

47.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, HFCU does something new and unexpected, during the middle of the night, during its nightly batch posting process.  Specifically, HFCU releases the hold placed on funds for the transaction for a split second, putting money back into the account, and then re-debits the same transaction a second time.

48.    This secret step allows it to charge overdraft fees (which it may incorrectly label as Non-Sufficient Funds fees) on transactions that never should have been subject to them— transactions that were authorized into sufficient funds, and for which HFCU specifically set aside money to pay them.   This discrepancy between HFCU's  actual practices and the contract causes accountholders to incur more overdraft fees than they should. In sum, there is a huge gap between HFCU's practices as described in the account documents and HFCU's practices in reality.

49.    The assessment of overdraft fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if

funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

50.     HFCU was and is aware that this is precisely how its members reasonably understand debit card transactions to work.  HFCU knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do.

51.     On information and belief, although access to Defendant's database will be sought by Plaintiffs to confirm, Plaintiff Nystrom was charged such inappropriate APPSN fees at least on the following occasion. On December 11, 2017, a charge posted for $88 that previously had been approved on December 8, 2017, but Defendant assessed a $30 fee even though funds were available when Defendant approved the charge. On information and belief, there are other examples but discovery will be required.

52.     HFCU has no authority to use an APPSN calculation to assess overdraft and NSF fees in its contract with its customers, and such practices breach its contracts with its customers and are also deceptive, unfair, and unconscionable.  These practices exploit any contractual discretion HFCU may have in its contracts with its customers in an unreasonable way that adds to HFCU's profits and harms its customers. Defendant does not describe this APPSN procedure in its contracts.  Instead, on page 16 of its Account Agreement, in its "Discretionary Overdraft Privilege Policy, HFCU states as follows:  "This privilege for checking accounts will be limited to a maximum of $1,000 **overdraft (negative) balances**."  (Emphasis added.) Yet it imposes fees on transactions where the money sequestered for the transaction did not cause the balance to be negative at the time it was sequestered.

53.     Further, page 4 of the Account Agreement expressly informs accountholders that "authorization holds" are immediately placed on debit card transactions, and that such holds can cause OD or NSF Fees for other, later transactions, but of course does not state that the

transaction on which the "authorization hold" was placed can also lead to a fee, as this would not make any sense:

**A temporary debit authorization hold affects your account balance** - On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Here is an example of how this can occur – assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $35 per overdraft, but we do not charge the overdraft fee if the transaction overdraws the account by less than $10.

You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in a specified amount, for example, $80. Our processing system authorizes a temporary hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $35 according to our overdraft fee policy. You will be charged this $35 fee

according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary he actual amount of your purchase.

54.    The Account Agreement also expressly states that authorization holds are placed immediately, and such held funds are off-limits for other transactions, as follows: "Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold."

55.    Furthermore, HSFCU issued a new Account Agreement dated September 1, 2020, that stated as follows on page 12 in a section called Overdrafts and Discretionary Overdraft Privilege Policy:

### V. Overdrafts and Discretionary Overdraft Privilege Policy

A request for a withdrawal of any kind that exceeds the available balance in your account at the time that the withdrawal is processed is deemed to be an "overdraft" and is governed by the provisions in this section. You agree that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that exceed the available balance does not obligate us to do so later. It is not incumbent on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. We will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

Previously, the Account Agreement prior to this change in the one dated September 1, 2020, stated as follows in a section titled Overdrafts on page 4:

**Overdrafts -** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card

transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

56.     Of course, when HFCU then authorizes debit card transactions on positive available funds and places an "authorization hold" for the amount of the transaction, not allowing it to be used for anything else, it then violates these Account Contract terms when it later charges OD Fees on such debit card transactions.

57.     On information and belief, this APPSN gimmick also breaches HFCU's second contract at issue, the Regulation E required contract.

58.     HFCU also has an improper practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, for the same electronic item.  HFCU charges a $30 fee when an electronic item is first processed for payment and HFCU determines that, in its opinion, there is not enough money in the account to cover the item.  HFCU then charges an *additional* NSF fee, or an overdraft fee following the first NSF fee, if the same item is presented for processing again, even though the account holder took no action to resubmit the transaction for payment.

59.     This charging of more than one fee for the same item breaches HFCU's Account Agreement.  HFCU's Account Agreement states at page 4, "You will be charged **an** NSF or overdraft **fee** according to our NSF or overdraft fee policy. You will be charged **the fee** even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase." (Emphasis added.)   In other words, HFCU uses the singular "a fee" not the plural "multiple fees."  Further, it does not state "per each presentment of an item" but rather states per "item."  HFCU also does not state that it ever will charge both "an NSF fee **and** an overdraft fee," for an item.  HFCU then says in its Account Contract to refer to the separate Fee Schedule for a listing of fees, which is updated periodically.

60.     Further, at all times during the relevant class period in this lawsuit, HFCU's Fee Schedules were consistent that the NSF charge would be for "per item" and not "for each presentment of a check" or "each presentment of an ACH transaction," as shown by the Fee Schedule effective in April 2018 states:

Non-sufficient funds (check and debit) .......$30.00 per item

61.     Nowhere does the Account Agreement or Fee Schedule effective during the class periods state that HFCU may charge multiple NSF fees "per item."

62.     This abusive practice is not universal in the financial services industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed.  Instead, Chase charges one NSF Fee even if a transaction is reprocessed for payment multiple times.

63.     Of note, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same "item" at least at a minimum make this clear in their Account Agreements or Fee Schedules, unlike Defendant.  They typically use terminology such as "per presentment" or "per each presentment" to make this clear, and often also add far more in explaining this to be sure it not ambiguous.  The following are just some examples from other banks and credit unions that make clear what HFCU was contractually required to do, if it was going to engage in charging multiple $30 NSF fees, or overdraft fees following an NSF fee, for the same item.

64.     Air Academy Federal Credit Union contracts for its NSF fee as follows:

> "$25.00 **per presentment**."

*See,* https://www.HFCU.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

65.     Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $25 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

66.     Community Bank, N.A. unambiguously contracts:

**You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

67.    Delta Community Credit Union contracts unambiguously as follows:

"$30 **per presentment**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020]. Further, in its Account Contract, Delta unambiguously states as follows:

The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

68.    First Financial Bank contracts unambiguously:

Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

69.    First Hawaiian Bank unambiguously contracts:

You agree that multiple attempts may be made to submit a returned item for payment and that multiple fees may be charged to you as a result of a returned item and resubmission.

*See,* https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_RXP1.pdf (emphasis added) [last visited on or about March 17, 2020].

70.    First Northern Credit Union unambiguously contracts its NSF fee as,

"$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count
(emphasis added) [last visited on or about March 17, 2020.

Further, in its Account Contract, First Northern unambiguously contracts as follows:

> You further agree that **we may charge an NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in an NSF fee), the merchant may re-present the check for payment again.  If the second and any subsequent presentments are returned unpaid, **we may charge an NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**

*See,*
(https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf
(emphasis added) [last visited on or about March 17, 2020].

71.    Glendale Federal Credit Union unambiguously contracts its NSF

fee as,

"$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

72.    Klein Bank contracts unambiguously:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis added) [last visited on or about March 17, 2020].

73.     Liberty Financial contracts its NSF fee unambiguously as:

"$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/  (emphasis added) [last visited on or about March 17, 2020].

74.     Los Angeles Federal Credit Union contracts its NSF fee unambiguously as:

"$29 **per presentment**."

*See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on or about March 17, 2020].

75.     Members First Credit Union contracts unambiguously:

We reserve the right to charge a Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,* http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf (emphasis added) [last visited on  or about March 17, 2020].

76.     Meriwest Credit Union unambiguously contracts its fee as:

"$35.00/item **per presentment**".

https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf (emphasis added) [last visited on or about March 17, 2020].

77.     Partners 1st Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

      78.    RBC Bank unambiguously contracts:

> "We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

      79.    Regions Bank contracts unambiguously:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

      80.    Tyndall Federal Credit Union lists its NSF fee as:

> "$28.00 **per presentment** (maximum 5 per day)."

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis added) [last visited on or about March 17, 2020].

      81.    USE Credit Union contracts unambiguously:

> "**Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

      82.    In a new Account Agreement dated September 1, 2020, in recognition that its Account Agreement contract did not allow it to charge more than one NSF Fee on the same item, HFCU changed the terms of its Account Agreement contract on this issue by now stating for the first time that it actually would charge a fee per each presentment of the same item, rather than per item, stating as follows on page 13 of its new Account Agreement dated September 1, 2020:

You agree that we may charge a Non-Sufficient Funds (NSF) fee for returning or rejecting transactions presented against your account that would exceed the available balance in your account. You further agree that we may charge an NSF fee each time a transaction is presented or submitted for payment even if the same transaction is presented for payment multiple times. For example, if you wrote a check to a merchant (or other individual or entity) who submitted the check to us for payment and we returned the check (resulting in an NSF fee), the merchant may re-present the check for payment again (or may convert the check into an ACH debit and submit the transaction for payment). If the second and any subsequent presentments or submissions are returned unpaid, we may charge a fee for each time we return or reject the transaction. You understand this means you could be charged multiple fees for one check that you wrote as that check could be presented (including as an ACH debit) and returned more than once.

83.     Therefore, if HFCU wanted to engage in this abusive practice, it was at least required to state and contract so, as these other financial institutions all do, and as it itself did as of September 1, 2020.  All these quotations show that the financial institutions differentiate between an "item" and a "presentment" of an item when calculating NSF or overdraft fees, and that Hanscom also knows this difference, as it evidences with its September 1, 2020, dated Account Agreement.  HFCU did not use the term "per presentment" in its contract prior to September 1, 2020.  Plaintiffs end the class period on this issue at the time this September 1, 2020, Account Agreement went into effect.

84.     Plaintiffs were harmed by Defendant's policy and practice of charging multiple fees on the same item.  It will be necessary to obtain Defendant's records to determine each instance of such wrongful overdraft or NSF fees, but HFCU breached its contracts with Plaintiff Preston by charging multiple NSF fees on the same item, and by charging an overdraft fee following an NSF fee, at least on the following occasion.  On information and belief, Plaintiff Preston was charged a $30 NSF fee on April 2, 2018 when she tried to make a Geico payment, and it was declined.  Then Plaintiff Preston again was charged an additional $30 fee on April 5,

2018 for this same Geico item when this same item was presented again.  HFCU therefore charged Plaintiff Preston two separate NSF fees of $30 each, or $60, for trying to pay this one Geico item.

85.     On information and belief, the above examples of damages transactions are just a few examples, and Plaintiffs believe that Defendant's database will reveal numerous other and different examples of the improper charging of such fees by Defendant.

86.     Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts. Plaintiffs did not and could not have, exercising reasonable diligence, discovered both that they had been injured and the actual cause of that injury until they met with their attorneys in or about August 2020.  While Plaintiffs understood that they were assessed fees, they did not understand the cause of those fees until about August 2020, because Defendant hid its actual practice from its members by describing a different practice in its contracts.  It also mis-labeled fees and made it next to impossible for a reasonable person to understand which fees applied to which transactions or were authorized, or that Defendant had violated obscure federal laws, including Regulation E.  This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

87.     Plaintiffs and the class members were harmed by these practices when they were assessed such fees when they should not have been.  A complete evaluation of HFCU's records is necessary to determine the full extent of Plaintiffs' harm from this practice.

## CLASS ACTION ALLEGATIONS

88.     The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

89.     Plaintiffs bring this case, and each of their respective causes of action, as a class

action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the

following classes:

**Class One:  The APPSN Class**

> **All United States residents who have or have had accounts with HFCU who**
> **incurred an overdraft fee on a transaction that was authorized into a positive**
> **available balance beginning six years preceding the filing of this Complaint**
> **and ending on the date the binding arbitration clause in the HFCU Account**
> **Agreement dated September 1, 2020, becomes effective.**

**Class Two:  The Repeat NSF Class**

> **All United States residents who have or have had accounts with HFCU who**
> **incurred an NSF fee more than once for the same item, or an overdraft fee**
> **following an NSF fee for the same item, during the period beginning six**
> **years preceding the filing of this Complaint and ending on the date the**
> **HFCU Account Agreement dated September 1, 2020, becomes effective.**

**Class Three:  The Regulation E Class**

> **All United States residents who have or have had accounts with HFCU who**
> **incurred an overdraft fee or overdraft fees for ATM or non-recurring debit**
> **card transaction(s) during the period beginning August 15, 2010, and ending**
> **on the date the binding arbitration clause in the HFCU Account Agreement**
> **dated September 1, 2020, becomes effective.**

90.     Excluded from the Classes are: (1) any entity in which Defendant has a

controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its

employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiffs and the Class Members.

91.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

92.     **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiffs, and can only be determined through appropriate discovery, Plaintiffs believes that the Classes are likely to include thousands of members based on the fact that HFCU has approximately $1.5 billion in assets and over 91,000 members.

93.     Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of HFCU 's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

94.     **Commonality** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiffs and the Class Members include, but are not limited to, the following:

        a.      Whether, pursuant to the Account Agreement, Defendant

        contracted that it would charge more than one NSF fee for the same item, each

time that same item was presented or re-presented;

b.     Whether, pursuant to the Fee Schedule, Defendant contracted it would charge more than one NSF for the same item, charging an NSF each time the same item was re-presented;

c.     Whether the Account Agreement or Fee Schedule is ambiguous on the issue of whether Defendant would charge an NSF Fee, or an overdraft fee following an NSF fee, every time the same item was re-presented;

d.     Whether the Account Agreement contracted for Defendant to charge an overdraft fee (which it may erroneously call an NSF fee) based on an APPSN calculation;

e.     Whether the Opt-In Contracted was ambiguous on whether HFCU would use an APPSN calculation for assessing overdraft fees;

f.     Whether Defendant abided by its funds availability policy;

g.     Whether Defendant complied with Regulation E.

95.    **Typicality** – Plaintiffs' claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees are uniform for Plaintiffs and all Class Members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiffs will also serve the interests of the other Class Members.

96.    **Adequacy** – Plaintiffs will fairly and adequately protect the interests of the Class

Members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and their counsel intend to prosecute this action vigorously.

97.  **Predominance and Superiority** – The matter is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiffs and the Class Members will continue to

suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

98.     Plaintiffs do not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class Members and that they will adequately represent the Class. This particular forum is a desirable forum for this litigation because Defendant resides in this District. Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

99.     Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiffs anticipate the use of additional media and/or mailings.

100.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

  a.  Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

    1.  Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

    2.  Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of

the other members not parties to the adjudication or substantially

impair or impede their ability to protect their interests. The parties

opposing the Class have acted or refused to act on grounds

generally applicable to each member of the Class, thereby making

appropriate final injunctive or corresponding declaratory relief

with respect to the Class as a whole.

b.   Common questions of law and fact exist as to the members of the Class and

predominate over any questions affecting only individual members, and a

class action is superior to other available methods of the fair and efficient

adjudication of the controversy.

### <u>FIRST CAUSE OF ACTION</u>

**(Breach of Contract)**

101.   The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

102.   Plaintiffs and each of the Class Members entered into an Account Agreement with

Defendant covering the subject of overdraft and NSF transactions.  This contract was drafted by

and is binding upon Defendant.

103.   Nowhere did the Account Agreement or Opt-In Contract state that HFCU would

sequester money upon authorization for a transaction and not allow it to be used for anything

else, but then charge a fee at the time of the posting of the same transaction when there had been

enough available money to cover the transaction when the money was sequestered.  Further,

nowhere did the Account Agreement or Fee Schedule at issue state that HFCU would assess an

additional NSF fee every time the same electronic item was re-presented for processing or

submitted as a "retry."  Also, nowhere did the Account Agreement or Fee Schedule at issue state

that HFCU would assess an overdraft fee following an NSF fee on the same item when the same item was re-presented for processing or submitted as a "retry."  HFCU wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement.  This also contradicted its own Fee Schedules.

104.    Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

105.    Defendant breached the express and implied terms of the Account Agreement and Fee Schedules by, *inter alia*, assessing multiple NSF and overdraft fees for the same electronic item.

106.    As a proximate result of Defendant's breaches, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

107.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

108.    Plaintiffs and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees, as well as the Fee Schedule. The contracts were drafted by and are binding upon Defendant.

109.    In the contracts, HFCU promised that it would only assess "a fee" (singular) when it determined a member did not have enough money in his or her account to cover an "item," not

"multiple fee**s**" for the same "item." In the Fee Schedule it stated the NSF fee or overdraft fee would be "per item", not "per each presentment of item." Nowhere in its contracts did Defendant state that it would charge more than one NSF or overdraft fee for a single item. Further, it did not state it would sequester funds for a transaction and thereby reduce the "available balance" by the amount of sequestered funds, yet potentially charge an overdraft/NSF fee at the time of the positing of the transaction despite already having set those funds aside.`

110.     Under Massachusetts law, good faith and fair dealing is implied in every contract. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit— not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

111.     The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiffs and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' and the Class Members' rights and benefits under the contracts.

112.     Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

113.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple fees for the same electronic item.  Defendant could easily have avoided acting in this manner by simply changing the programing in its software to charge only an NSF "per item" as its own Fee Schedule stated it would do.  HFCU also acted in bad faith when after sequestering funds for a particular transaction and not making them available for any other use, nonetheless at the time of posting charging an overdraft/NSF fee on that same transaction for which funds already had been set aside. Defendant unilaterally elected to and did program its software to create this APPSN accounting gimmick to maximize its overdraft/NSF fees.   In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiffs and the Class Members of the full benefit of the contracts.

114.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

115.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

116.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

117.    Because Plaintiffs and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF and other fees assessed by Defendant, Plaintiffs and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this

benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiffs and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

118.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

119.    Defendant has obtained money from Plaintiffs and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

120.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and the Class Members, and thus, this money should be refunded to Plaintiffs and the Class Members.  Therefore, Plaintiffs and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E)
### C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

121.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

122.    By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

123.    Specifically, the charges violated what is known as the "Opt-In Rule" of Reg E.

(12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or*

*charge ...* pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the

consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft*

*service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*"

to enter into the overdraft program (*Id.*)  The notice "shall be clear and readily understandable."

(12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial

institution must provide a segregated description of its overdraft practices that is accurate, non-

misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must

provide its customers a reasonable opportunity to opt-in after receiving the description.  The

affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the

financial institution must provide confirmation of the opt-in in a manner that conforms to 12

C.F.R. § 1005.17.

124.    The intent and purpose of this Opt-In Contract is to "assist customers in

understanding how overdraft services provided by their institutions operate .... by explaining the

institution's overdraft service ... in a clear and readily understandable way"—as stated in the

Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the

CFPB's official interpretation of its own regulation," "warrants deference from the courts unless

'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg

E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016)

(quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's

Official Staff Commentary for the Truth In Lending Act's Reg Z).

125.    HFCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires

affirmative consent before a financial institution is permitted to assess overdraft fees against customer's accounts through an overdraft program for ATM and non-recurring debit card transactions.  HFCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including *inter alia* failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.  It did not in its Opt-In Contract describe in a "clear and readily understandable way" that it would be using its APPSN accounting gimmick to assess overdraft fees on ATM and debit card transactions.

126.    As a result, HFCU has harmed Plaintiffs and the Class.

127.    Due to HFCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiffs and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit.

## PRAYER

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For statutory damages;

5.    For an order enjoining the wrongful conduct alleged herein;

6.    For costs;

7.    For pre-judgment and post-judgment interest as provided by law;

8.    For attorneys' fees under the common fund doctrine, and all other applicable law

and sources; and,

9.      For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class Members demand a trial by jury on all issues so triable.

Dated: August 31, 2020                          Respectfully submitted,

/s/ Raymond Dinsmore (BBO # 667340)
**Hayber, McKenna & Dinsmore, LLC**
Raymond Dinsmore, Esq.
RDinsmore@HayberLawFirm.com
One Monarch Place, Suite 1340
Springfield, MA  01144
413-785-1400

**THE KICK LAW FIRM, APC**
Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
Jeffrey C. Bils, CA Bar No. 301629*
Jeffrey@Kicklawfirm.com
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Kevin P. Roddy – NYSBA # 652585*
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
E-mail:  kroddy@wilentz.com

*_Pro Hac Vice_ applications to be submitted.

Attorneys for Plaintiffs Lindsey Nystrom and
Andrea Preston and the Putative Class